JOHN HENDERSON AND GUSTAVUS HENDERSON *vs.* WILLIAM E. MAYHEW AND OTHERS. WILLIAM E. MAYHEW AND OTHERS *vs.* JOHN AND GUSTAVUS HENDERSON.—*December* 1844.

On the 6th October 1841, *B.* executed an absolute bill of sale to *M.*, for a vessel, on which, on the 8th, he took out a register in his own name, and made the usual oath required by the act of *Congress.* On the 15th November 1841, *B.*, who continued in possession, chartered the vessel for a foreign voyage, to *H.*, who appointed *C.* master, and he, in November, and to the 15th December, purchased materials for her outfit, by *B's* directions. On the 20th, the account for materials was delivered to *B.* On the 19th January 1842, the charter party, made by *B.*, was assigned and delivered by him to *M.*, who then effected insurance on the vessel and freight, after an enquiry of *B.*, of the nature and particulars of the voyage. Upon the return of the vessel, in August 1842, *M.* received the freight, paid the port charges, for the first time took possession of her; in November sold her, and received the money; never having before had any possession and control of the vessel. In an action brought by the material man against *M.*, for the supplies furnished as aforesaid, HELD:

1st. That the plaintiffs were not entitled to recover, upon the mere finding of the fact by the jury, that *M.* was the owner of the vessel, at the time the articles furnished her, were sold and delivered. Nor in addition to the fact of ownership, as aforesaid, the circumstances, that the supplies were furnished, and that *M.* received the benefit of them.

2nd. That it was not competent for *M.* to show, by parol proof, that his bill of sale was intended to be a mortgage; that it was so designed and agreed, between him and *B.*

50    v.2

3rd. It was not competent, to either plaintiff or defendant, under the circumstances of this case, by any form of prayer, to withdraw the question of *B's* agency for *M.*, in procuring materials for the ship, from the consideration of the jury.

Where there was evidence offered, that *M.* was the owner of a vessel at the time she was furnished with supplies, but the account against her and her owner, was sent to *B.*, her previous owner, for payment, this cannot discharge *M.*, if, but for this proof, he would have been answerable.

Unless the vendor knows, at the time of sale of chattels, who his principal is, and notwithstanding such knowledge, makes the agent his debtor, the principal is not discharged.

The jury are exclusive judges of the weight of parol evidence offered to them, tending to prove an agency.

Oral proof is inadmissible, to change or contradict the terms of a written instrument.

Strangers to an instrument, when authorised to impeach or contradict it, may offer parol testimony for that purpose; and so a grantor may in a controversy with a grantee, if he charges the same to have been obtained by fraud or mistake

Parties to a written instrument are not permitted, in controversies with strangers, to insist, that it does not express what it was intended to express.

Where a defendant obtained an absolute bill of sale for a vessel, authorizing the community to regard him as the owner thereof, he cannot for his benefit, be permitted to allege in an action against him, by a stranger to the instrument, that it is a mortgage.

CROSS APPEALS from *Baltimore* County Court.

This was an action of *assumpsit*, brought to May term of *Baltimore* county court 1842, by *J.* and *G. Henderson* against *William E. Mayhew* and others. The plaintiffs declared for goods sold and delivered, &c., and the defendants pleaded *non assumpsit.*

The jury found a verdict for the defendants.

Upon the trial of this cause, the plaintiffs, to support the issue upon their part, offered in evidence by *Samuel Ellis*, that he was a clerk for the plaintiffs, during the whole of the year 1841, and for several years before that time; and that he is now their clerk. That in the months of November and December 1841, a certain *William Champion*, who was then the master of the brig *Harriet*, of *Baltimore*, ordered from the plaintiffs, certain materials and supplies for said brig, for a

voyage to the coast of *Africa;* that said materials and supplies were furnished to said brig, upon said order, and were charged in the books of the plaintiffs, to the "brig *Harriet* and owners." That a bill of parcels of said materials and supplies, was shortly afterwards made out from the books of the plaintiffs, and presented to the said captain, who certified to the correctness of said bill; and that the bill now shewn to the said witness, is the original bill of parcels, of said articles, as certified by the said captain to be correct.

"*Baltimore,* December 20th, 1841. *The brig Harriet & Owners,* bought of *John Henderson & Co.,* ship chandlers and manufacturers of patent cordage, No. 71, *Pratt* street :

1841.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Nov. | 23, | 87½ lbs. Russia rope, | *a* | 12½ | cents, | - | $10 | 93 |
| " | 29, | 522 lbs. do. do. | *a* | 12½ | " | - | 65 | 37 |
| Dec. | 6, | Coils Manilla rope, 407 lbs. | *a* | 14 | " | - | 56 | 98 |
| " | " | 58 lbs. Russia rope, | *a* | 12½ | " | - | 7 | 25 |
| " | 15, | 250½ lbs. do. do. | *a* | 12½ | " | - | 31 | 31 |
| " | " | 557½ lbs. Manilla do. | *a* | 14 | " | - | 78 | 05 |
| " | " | 10 lbs. Tar'd Marline, | *a* | 20 | " | - | 2 | 00 |
| " | " | 12 lbs. Sewing twine, | *a* | 50 | " | - | 6 | 00 |
| " | " | 2 lbs. Whipping twine, $1. 1 doz. | | | | | | |
| | | Needles, 50 cts. 2 Palms, 75, | | | | - | 2 | 25 |

(6 *Months.*)          $260 14

W. CHAMPION"

That shortly after said bill of parcels had been certified as correct, by the said captain of said brig, it was presented and delivered by the witness, as clerk of the plaintiffs, at the counting-room of *Hugh Boyle,* for payment, when it should become due, or before, at the option of said *Boyle;* that the materials were furnished on a credit of six months; but that it was customary to deliver bills for supplies, soon after they are furnished for a vessel, in order that the owners may be able to enter them in the account of the expenses of the vessel; but that sometime afterwards, how long, the witness does not recollect, having heard from some person, he thinks one of the

plaintiffs, that *Mr. B.* was not the person to pay, he, (the witness,) went to the counting-room of *Mr. B.*, for the purpose of getting the bill; *Mr. B.* was in, and he asked him for the bill, and *B.* took it out of a bundle, and gave it to witness; that no further conversation was had with *B.* on the subject.    The plaintiffs, further to support the issues on their part, gave in evidence a bill of sale, executed by *Hugh Boyle* to the defendants, on the 6th October 1841, for the said brig *Harriet;* which said bill of sale was admitted by the defendants, to have been signed and sealed, and delivered by the said *B.* to the defendants, on the said 6th October 1841; and which said bill of sale is as follows:

"Know all men by these presents, that I, *Hugh Boyle*, of *Baltimore*, State of *Maryland*, sole owner of the brig or vessel, called the *Harriet*, of *Baltimore*, for, &c., of $6000, to me in hand paid, at &c. by *William E. Mayhew*, *Alexander Fisher* and *Wm. D. Miller*, the receipt whereof is hereby acknowledged, have granted, &c., and by these presents do grant, &c., unto the said *W. E. M.*, *A. F.*, and *W. D. M.*, their, &c., the whole of said brig *Harriet*, of *Baltimore*, together with all and singular, her masts, &c.    She now lies in the port of *Balmore*, and is more particularly described in a certificate of registry, granted her at the port of *Baltimore*, in the following words, &c."

And further gave in evidence by *Ring*, a competent witness, that he was a clerk in the custom house at *Baltimore*, in the year 1841; and that on the 8th October in said year, the defendants appeared in said custom house, and in pursuance of the revenue laws of the *United States*, took out the following register for the said brig, and made the oath therein contained.

"In pursuance of an act of the Congress of the *United States of America*, entitled, an act concerning the registering and recording of ships or vessels, *William E. Mayhew*, *Alexander Fisher* and *William D. Miller*, of *Baltimore*, State of *Maryland*, having taken or subscribed the oath required by the said act; and having sworn that they are the only owners of the ship or vessel, called the *Harriet*, of *Baltimore*, whereof

*Alexander Fisher* is at present master, and a citizen of the *United States*, as he hath sworn: and that the said ship or vessel was built in *Baltimore*, &c."

"We, *W. E. M.*, *A. F.*, and *W. D. M.*, of &c., do swear, according to the best of our knowledge and belief, that the brig called the *Harriet* of *Baltimore*, is of the burthen of two hundred and twenty-five and $\frac{34}{95}$ parts of a ton, and was built in *Baltimore*, in the State of *Maryland*, during the year 1822; that we are citizens of the *United States;* that our present place of abode or residence, is as above, and that we are the true and only owners of the said vessel; that there is no subject nor citizen of a foreign prince or State, directly or indirectly, by way of trust, confidence, or otherwise, interested therein, or in the profits or issues thereof, so help us God.

(Signed,)                        W. E. MAYHEW,

A. FISHER,

WM. D. MILLER."

"Port of *Baltimore*.—Sworn to this 8th day of October 1841, before        (Signed,)        N. H. WILLIAMS, Collector."

"I, *Alexander Fisher*, master and commander of the said brig called the *Harriet*, of *Baltimore*, do swear, that I am a citizen of the *United States*, having been born in *Baltimore*, State of *Maryland*.        (Signed,)        ALEX'R FISHER.

Custom House, *Baltimore*, 28th February 1841."

And that *A. Fisher* was named and sworn by said defendants to be the master of said brig in said register, at the time of taking out the same; which said *A. Fisher*, the defendants admitted, was, at that time, one of the defendants mentioned as a grantee in said bill of sale.

The plaintiffs, further proved by the said *Ring*, that he has been for several years a clerk in the custom house; and that persons were permitted at the custom house, to endorse upon the register of a vessel, a memorandum of a mortgage, when they desired it; and that such memoranda were sometimes made.

The plaintiffs, further to support the issue upon their part, offered in evidence by *W. L. Brockelman*, that during the year

1842, he was a clerk in the office of the *Neptune Insurance Company*, of *Baltimore;* and that on the 19th January 1842, the defendants applied for insurance upon the brig *Harriet* and her freight, for a voyage to the coast of *Africa* and back; that the said offer for insurance, and the acceptance now shewn to the witness, is the said original application, signed in the proper hand writing of the defendants.

"*Balto.*, Jan'y 19 1842. Insurance is wanted by *Wm. E. Mayhew & Co.*, for account of whom it may concern: amount of loss, if any, to be paid to them, to the amount of $4000, on the brig *Harriet, Captain Champion*, valued thereat; from *Baltimore*, on a trading voyage, to the *American* colonies on the coast of *Africa*, and their vicinity, and back, to a port in the *United States*. They understand this to be the third voyage of *Capt. Champion* on that coast, and an acclimated supercargo went out in the vessel. They also want insurance on freight, to be valued at $2500, and considered as earned at all periods of the voyage. What is the required premium? The *Harriet* is reported by Capt. *Clackner* in November, and cleared at this port in December last."

"Nine p. ct. Accepted, WM. E. MAYHEW & Co."

And that in pusuance of said offer and acceptance, he made out and delivered to the defendants, a policy of insurance upon said brig and freight.

The plaintiffs, further to support the issue upon their part, offered in evidence, by competent witnesses, that upon the return of the said brig from the coast of *Africa*, upon said voyage, the defendants received the freight for said voyage, and paid the port charges of said brig in the port of *Baltimore;* and that on the 2nd November 1842, the defendants sold said brig to *Greenbury B. Wilson*, and conveyed the same to him by bill of sale, which was signed, sealed and delivered, by the said defendants to the said *Wilson*, on the day of its date, to have and to hold the said brig absolutely.

And that the defendants received the consideration money, mentioned in said last mentioned bill of sale.

The defendants, to support the issue upon their part, and for the purpose of shewing that the defendants were not the absolute owners of the brig *Harriet*, but only mortgagees, gave in evidence by *Samuel Ellis*, the witness sworn on behalf of the plaintiffs, upon cross examination of said witness, that the said *Hugh Boyle* never told him, (the witness,) that he, (*Boyle*,) was the person to pay the said bill. That the reason why he presented the bill to the said *Boyle*, was, because he considered said *Boyle* was the owner of said brig. That the plaintiffs had, for some time previously, furnished supplies for vessels belonging to said *Boyle;* and he believes they had furnished some, once before, for the said brig *Harriet*, and were paid for them by *Boyle.* The defendants, then, for the said purposes, gave in evidence by *James Hall*, a competent witness, who being duly sworn, testified, that he and the said *Hugh Boyle*, on the 15th November 1841, executed the charter party for the brig *Harriet*, now shewn to the witness, which is in the words following, &c. This was for a voyage from *Baltimore* to the coast of *Africa*, and back, and described *Hugh Boyle* as owner. That under a contract with said *B.*, for said charter party, he took possession of said brig, some days before the date of said charter party, as the freighter of said vessel, and to hold the possession and control of said brig, upon the contract and terms of said charter party, thenceforth, until sometime in August or September 1842, the time when the voyage, described in said charter party was terminated, on the arrival of said brig from the coast of *Africa* to the port of *Baltimore*. That he, the said *James Hall*, as the freighter of said vessel, appointed *William Champion* her master, about the date of said charter party. That the defendants never had any possession of said vessel, to the knowledge of this witness, until after she returned from the coast of *Africa*, in August or September 1842; that after her return, and after the termination of said voyage, the defendants took possession, and they received the freight due upon said charter party; that when, or about the time when the said vessel was chartered to him the said *James Hall*, he told said *Boyle*, that the

said master, *William Champion*, might act as his, *Boyle's* agent, in superintending the repairs which he, *Boyle*, was bound by the charter party, to put upon said vessel, to fit her for the intended voyage; and that the said master did superintend those repairs, and from time to time, called upon, and received from said *Boyle*, instructions or orders, where and of whom to procure materials for the making of such repairs, and purchased them accordingly; and that the materials for which this suit is brought, were necessary for said brig upon said voyage. And the defendants, for the purpose of shewing that they were mortagees, out of the possession of said brig, further offered in evidence, by *Charles Oudesluys*, that he, this witness, was the clerk of the said *H. B.*, throughout the whole of the year 1841, and until July 1842; and during that time, acted in the capacity of his book keeper, in his counting-room in the city of *Baltimore*, the residence of said *B;* that the witness drew up the bill of sale from said *H. B.* to the defendants, or to three of them therein named, and witnessed the execution thereof; that he knew the object of said bill of sale, from the conversations he heard before its execution, between the said *Boyle* and *William E. Mayhew*, one of the defendants ; that the object of it was to secure to the defendants, constituting the firm of *William E. Mayhew & Co.*, payment of the said *Hugh Boyle's* note, viz :

"\$2,628.17.     *Baltimore*, October 7th 1841.     Four months after date, I promise to pay to the order of *Messrs. William E. Mayhew & Co.*, twenty-six hundred and twenty-eight dollars and seventeen cents.

No. 2163.     Due 7th.     10th Feb. 1843.     H. BOYLE."

That he, the witness, had no particular instructions in what form to draw up the bill of sale; that he made it absolute upon its face, supposing it would answer the object designed; that in one instance before, where *Mr. Boyle* had made a bill of sale of a vessel called "*The Serene*," as security, it was made absolute on its face; that the said vessel was valued by *Boyle* at \$6000, and he mentioned that sum to the witness, to be put as the consideration in said bill of sale; that said bill of sale

was given by the witness, after it was drawn up, to *Boyle*, who the witness supposed read it, and executed it.   The money which was advanced to *Boyle*, (as a discount of his said note,) by *William E. Mayhew & Co.*, was deposited by said *Boyle*, in the *Farmers and Planters Bank;* and this witness, as clerk as aforesaid, without any special instructions from said *Boyle ;* but in the discharge of what he considered his duty, as said *Boyle's* clerk, in the recording of transactions in his business, on the 9th of October 1841, made the following entry in said *Boyle's* journal:

Copy of entry in *H. Boyle's* journal, 9th Oct. 1841.

"Sundries to Bills Payable.

*Farmers and Planters Bank.*

P'ds, No. 1218.   4 months, 7th instant, for $2,628.17, favor *W. E. Mayhew & Co.*, collaterally secured by a bill of sale for the brig *Harriet,* valued at $6000,   -   $2,573.42

*Interest.*

Out for the discount,   -    -    -    -    54.75

$2,628.17"

The defendants, for the same purposes, further gave in evidence, by the said witness, *Charles Oudesluys,* that he knows that the identical account of the plaintiffs, now shewn to him, was presented and left for payment at the counting house of said *Boyle;* and that he, as clerk as aforesaid, entered the amount of said account to the credit of the plaintiffs, in the books of the said *Boyle*, on the 20th December 1841, while it was remaining in said *Boyle's* possession; that he noted the date of said entry on the face of said account, which he now recognizes in his handwriting; that said account was sometime afterwards withdrawn by the plaintiffs, or their clerk; that the said plaintiffs had furnished to the said *Boyle,* materials for other vessels; and afterwards, in April 1842, they furnished him materials for the steamboat *Virginia,* of which *Boyle* was the sole owner; but never before furnished materials for the said brig *Harriet.*   That the whole amount of the accounts for materials or supplies, furnished to the said *Boyle*

51   v.2

by the plaintiffs, as credited to them in his books, including the account for the materials and supplies furnished for the said brig *Harriet*, is $507.67. A note was given by *Boyle* to the plaintiffs, for a part of said account, which fell due 23rd April 1842; but said note did not embrace the amount of supplies furnished the brig *Harriet*, now sued for, in this cause; that said *Boyle* had owned the said brig *Harriet* for four or five years; that on or about the 19th January 1842, the said *William E. Mayhew*, having seen the advertisement of the time of the sailing of the said brig *Harriet*, upon said voyage to the coast of *Africa*, called down at the counting house of said *Boyle*, to inquire the nature and particulars of said voyage, in order to procure insurance upon said brig, and the freight under the charter party; and that about the same time, this witness drew up the assignment of the charter party from the said *Boyle* to *William E. Mayhew & Co.*, as a further security for the note aforesaid, mentioned in said assignment, which he saw said *Boyle* execute, and which, by his direction, this witness delivered to the said *William E. Mayhew* on the day of its date, together with the charter party itself; which charter party and assignment, were then read in evidence to the jury. And the defendants, further gave in evidence by the said witness, *Oudesluys*, that the said defendants never took possession of said brig, or exercised any control over her, until after her return from *Africa*, in August or September 1842; and that said *B.* continued, in all respects, to act as the owner of said brig, after said bill of sale, as he had done before its execution. That the amount of the premium notes, given by the said *William E. Mayhew & Co.*, for the insurance of said brig and freight, were credited to them by this witness, in said *Boyle's* book, or journal, on the 29th of March 1842.

Copy of entry, 29th March 1842.

"Disbursements of brig *Harriet* to *Wm. E. Mayhew & Co.* Insurance effected by them in their name at the *Neptune* office, in this city, 19th January 1842, viz: $4000 on vessel, and $2500 on freight. Brig *Harriet*, from *Baltimore* to *American*

*colonies* on the coast of *Africa,* and back, 9 per cent., 6
months, - - - - - - - $685.00
    Two policies, at $1 - - - - - 2.00

                                       $687.00

Ship credited $587."

That he should have entered this credit at the time when
the insurance was effected, had he known the amount: he says
he thinks there is an error in the amount, of one hundred dol-
lars; that the said *William E. Mayhew & Co.* paid the said
premium notes, and charged them in account with said *Boyle,*
against the said brig and her freight; that when the said note
of *Boyle,* in favor of said firm, for $2,628.17, became due, on
the 10th of February 1842, it was not paid by said *Boyle;*
and this witness, as clerk as aforesaid, credited the same to
*William E. Mayhew & Co.,* the defendants, in the journal of
said *Boyle,* as having been secured by the said bill of sale of
said brig *Harriet;* that the form of the entry was as follows:

                         "February 10, 1842.

    "*Bills Payable* to *W. E. Mayhew & Co.,* No. 1218, my note
discounted by them, due this day, and not paid, secured by a
bill of sale of the brig *Harriet,* and an assignment of her
freight: $2,628.17."

That after the said bill of sale was executed, the said *Boyle*
continued in possession of the said brig *Harriet,* and exercised
acts of ownership over her, just as if the bill of sale had not
been made; chartered her to *James Hall,* by the charter party
above mentioned; and gave *Captain Champion* orders where
to get the materials for the repairs, which he, *Boyle,* agreed to
put upon her, under said charter party; that upon the return
of said vessel from *Africa,* in August or September 1842, the
defendants took possession of said vessel, and sold her; that
the defendants had never had any possession or control over
said vessel, before her return from *Africa,* as aforesaid; that he,
the witness, never informed the plaintiffs, that *B.* had trans-
ferred the said brig to the defendants; he thinks he went once
with *Captain Champion,* to the store of *Henderson & Co.,* the

plaintiffs; that in July 1843, *Mr. Boyle* made an assignment of his property to *Grafton L. Dulaney*, in trust for creditors; that after the return of said brig, and after she had been sold by the defendants, the witness, as agent of the said *Dulaney*, as trustee of said *Boyle*, called upon *William E. Mayhew & Co.*, at their counting room, and stated to said *Mayhew*, that the bill of sale of said brig, and the assignment of her freight, under the charter party, had been made by *Boyle*, as collateral security; and that he, the witness, desired to know what surplus funds there would be, and notified the said *Mayhew*, that the surplus would be payable to said *Dulaney*, as trustee, and requested said *Mayhew* not to pay said surplus to any other persons; that said *Mayhew* referred said witness to *Mr. Cook*, the book keeper of said *William E. Mayhew & Co.*, for information, as to the surplus that would remain, of the proceeds of sale, of said brig and her freight, after satisfying their claims; and directed said book keeper to give the witness the information desired; that said book keeper examined the accounts in the books of the defendants, and gave the witness an extract on a piece of paper, of the amount of such surplus, as being about three hundred dollars; that afterwards, some further expenses were paid, and the amount reduced. In order that the defendants might have a more formal notice, the witness went to *George M. Gill, Esq.*, (*Mr. Dulaney* being out of town,) and told *Mr. Gill* the circumstances, and requested him to address a line to said defendants, on behalf of *Mr. Dulaney*, as trustee of *Mr. Boyle*, and he did so, and the following is the letter sent on that occasion:

"Dear Sir: I understand, that after paying your claim against the brig *Harriet* and her freight, there will remain a balance. To this balance, *Mr. Dulaney*, as trustee of *Hugh Boyle*, is entitled, and I now notify you that it will be claimed.

GEO. M. GILL, Att'y for <em>G. L. Dulaney.</em>

<em>Baltimore</em> 17th August 1842."

To *Messrs. W. E. Mayhew & Co.*"

That said *Dulaney* sanctioned said letter, and all that the witness did as his agent in the premises; that the said *Hugh*

*Boyle* was in tolerable good credit when the supplies were furnished by the plaintiffs, for said brig, but not in such good credit as he had been before; that neither *Boyle* nor the witness as his clerk, had made any investigations or statements with a view to ascertain his solvency; that he was, at that time, possessed of a considerable amount of property, real as well as personal; that the witness could have purchased goods on *Boyle's* credit in the market, without question; that the first of *Boyle's* paper that was dishonored, was a note that became due on the 24th of December 1841; and further stated, that he, the witness, as the clerk and book keeper of said *Boyle*, had knowledge of *Boyle's* condition, which the public had not; but that the public would have trusted him at the time the supplies sued for in this action were furnished.

The plaintiffs then prayed the court, by their counsel, as follows:

1st. That if the jury shall believe, from the evidence in this cause, that the defendants were the owners of the brig *Harriet*, at the time the articles furnished her by plaintiffs were sold and delivered, that then the plaintiffs are entitled to recover.

2nd. That the evidence offered in this cause by defendants, to prove that the bill of sale of 6th October 1841, was intended to be a mortgage, is inadmissible and incompetent for that purpose.

3rd. If the jury shall believe from the evidence, that the defendants in this case were the owners of the brig *Harriet*, at the time the supplies in this case were furnished, and that said supplies were charged to the said brig and owners, and that said supplies were furnished to said vessel, and that the defendants received the benefit of said supplies; that the plaintiffs are entitled to recover, notwithstanding the jury shall also find that the said supplies may have been ordered through the agency of *Champion*, the captain of said vessel, and that the bill of particulars in this case was left with *Boyle* for settlement.

The defendants, by their counsel, in like manner prayed the court, as follows:

1st. That if the jury find from the evidence, that the bill of sale of 6th October 1841, from *Boyle* to the defendants (or three of them,) was made by way of mortgage, or collateral security, to secure the payment of the note of *Boyle* for $2,628.17, dated 7th October 1841, at four months; and that the assignment of the charter party, by *Boyle*, to the defendants, on the 21st January 1842, was made as a further security for the payment of said note; and if the jury further find, that the defendants never gave any order or authority to the plaintiffs, or to any other person, for the furnishing of the materials charged in the account of the plaintiffs, the price or value of which, they seek to recover in this action; and if they further find, that the defendants never took, or had, or exercised any possession or control of the said brig, until she returned to the port of *Baltimore*, upon the termination of her voyage under the charter party, made between *Hugh Boyle* and *James Hall*, then the plaintiffs are not entitled to recover in this action; notwithstanding that the bill of sale is absolute on its face, and notwithstanding the oath and registry made and procured at the custom house by the defendants, or some of them, notwithstanding the insurance procured by the defendants upon their order on the vessel and freight, and notwithstanding the defendants, after the return of said vessel as aforesaid, in August or September, 1842, did take possession of and sell her for the purpose of paying the defendants the amount of the said note, the premium of insurance on the said vessel and freight, and other expenses incidental to the entry of the vessel at the port of *Baltimore*.

2nd. If the jury find, from the evidence, that the supplies charged in the plaintiffs' account were furnished to the brig *Harriet*, upon the credit and upon the authority of *H. B.*, and not upon the credit of the defendants, that then the plaintiffs are not entitled to recover.

3rd. If the jury find, from the evidence, that the defendants never took possession of, nor exercised any control over the brig *Harriet*, until she returned from her voyage under the charter party; and that between the 23rd of November and

the 15th December 1841, inclusive, (comprising the dates of the plaintiffs' account,) *James Hall*, the freighter, or *Wm. Champion*, as the master appointed by him, or both together, had the actual possession and charge of said vessel, under said charter party; and that the plaintiffs, within that period, did not know that the defendants had any title or interest in said vessel, but knew, or supposed, that *H. B.* had been, and was, the owner of said vessel, that then the plaintiffs are not entitled to recover in this action, by reason, that the law upon that state of facts, does not raise or imply an *assumpsit* on the part of the defendants, to pay for the supplies furnished by plaintiffs for said vessel, within that period, upon the order of the said master, without the knowledge or authority of the defendants.

The county court (ARCHER, C. J. and PURVIANCE, A. J.,) rejected the *first* and *third* prayers offered by the plaintiffs, and granted the *second* prayer offered by them.

The court also refused the *first* prayer offered by the defendants, and granted their *second* prayer, and in addition thereto, and in lieu of the defendants' *third* prayer, gave also the following instructions to the jury.

If the jury believe that the defendants were owners of the brig, yet if they believe that *Hugh Boyle*, with the consent and permission of the defendants, chartered the brig to *Hall*, for a voyage to the coast of *Africa*, according to the terms of the charter party offered in evidence, and that the same was assigned by *Boyle*, as a security to the defendants, for their indebtedness to him, and that the defendants accepted said assignment, and that the materials for which this suit is brought were furnished after the date of the charter, and before the date of the assignment, the defendants, as legal owners of the ship, are not answerable for the materials furnished, unless the jury should believe, that the plaintiffs furnished the materials on the credit of the defendants, as the legal owners.

To the rejection by the court, of the *first* and *third* prayers, offered by the plaintiffs, and the granting of the *second* prayer, offered by the defendants, and additional instructions of the court, the plaintiffs, by their counsel, excepted.

The defendants, under the provisions of the act of Assembly of December session 1831, chap. 319, beg leave to except, as well to the opinion of the court in refusing to grant their *first* and *third* prayers, as also to the opinion of the court in granting the plaintiffs' *second* prayer, and prayed the court to sign and seal this bill of exceptions on their behalf, which was done.

Both parties appealed to this court.

The cause was argued before DORSEY, SPENCE and MAGRUDER, J.

By TEACKLE and STEELE, D. A. G., for the plaintiffs below, and

By HINCKLEY for the defendants below.

MAGRUDER, J., delivered the opinion of this court.

This action was brought by the appellants, to recover from the appellee a sum of money alleged to be due, for supplies furnished for the brig *Harriet*, by the appellants.

It is not disputed that the supplies were furnished, but it is insisted by the appellees, that they are not responsible for them.

1st. Because they were not the owners of the vessel:

2nd. Because the credit was given to another, to wit, to *Hugh Boyle.*

There was certainly evidence offered to the jury, that the appellees were the owners of the vessel at the time that she was furnished with the supplies. But the account against the vessel and its owner, was sent to *Boyle*, and this it is supposed, was giving credit to him. It appears however, that *Boyle* was at one time the owner of the vessel, and it would seem that the account was sent to him, under an impression that he was still the owner. This proof of the account being sent to *Boyle*, cannot discharge the owner, if, but for this proof, he would have been answerable. Unless the seller knows at the time who the principal is, and notwithstanding that knowledge, makes the agent his debtor, the principal is

not discharged.   (*See Roscoe on Evidence* 216, and the authorities there collected.)   Notwithstanding all the testimony, then, on the part of the appellees, designed to show that the credit was given to *Boyle*, the former may be answerable, and it is a material question in the case, whether *Boyle*, in purchasing these supplies, is not to be regarded as the agent of the appellees?   There was testimony offered to the jury, "tending to prove" the agency.   Of the weight to which that testimony was entitled, the jury are the exclusive judges.

The court below, therefore, erred in granting the second prayer of the defendants below, as it withdrew the question of agency from the consideration of the jury, and also in giving the instruction which was given, in lieu of the instruction asked for by the appellees in their third prayer.

No error is discovered in the rejection of the appellants' first or third prayer.

The appellants, who were defendants in the court below, took exception to the opinion of the court, that parol evidence was inadmissible to show, that the bill of sale was intended to be a mortgage.   It is the opinion of this court, that the decision was correct.   Parol evidence is inadmissible to change or contradict the terms of a written instrument.   Strangers to the instrument, when authorized to impeach or contradict it, may offer parol testimony for that purpose; and so a grantor may, in a controversy with the grantee, if he charges the same to have been obtained by fraud or mistake.   But the parties to a written instrument are not permitted, in controversies with strangers, to insist, that it does not express what it was intended to express.   The appellants, after obtaining an absolute deed, and authorizing the community to regard them as the owners of the vessel, cannot now, for their own benefit, be permitted to allege that their bill of sale is a mortgage.

The party here, who is a stranger to the deed, insists, that it is what it purports to be, and the appellants who accepted it, are precluded from offering the evidence on which they rely, in order to defeat the action against them.

52     v.2

Judgment must therefore be *reversed* upon the appeal of the plaintiffs below, upon this second prayer; and upon the instructions given by the court to the jury.    And *affirmed* upon their first and third prayers.

Upon the appeal of the defendants below, the instructions to which they excepted, are affirmed.

DORSEY, J., dissented to the affirmance, upon the appeal of the defendants below.

JUDGMENT REVERSED UPON THE APPEAL OF J. & G. HENDERSON, AND PROCEDENDO AWARDED.